```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
```

ROBERTO MARTINEZ-CEPERO,          :
                                  :    HONORABLE JOSEPH E. IRENAS
          Plaintiff,              :
                                  :    CIVIL ACTION NO. 06-2252 (JEI)
     v.                           :
                                  :
WILLARD P. WAGNER, IV, and        :    **OPINION**
WILLARD P. WAGNER, III,           :
                                  :
          Defendants.             :

**APPEARANCES:**

DAVID K. LONG AND ASSOCIATES
By:  David K. Long, Esq.
1555 Zion Road, Suite 100
Northfield, New Jersey 08225
     Counsel for Plaintiff

CHIERICI, CHIERICI & SMITH
By:  Julie C. Smith, Esq.
Blason-Camous III
509 S. Lemola Road, Building 6
Moorestown, New Jersey 08057
     Counsel for Defendants


**IRENAS**, Senior District Judge:

   This is a personal injury diversity suit subject to New Jersey's Automobile Insurance Cost Reduction Act ("AICRA"), N.J.S.A. 39:6A-1.1 et. seq.[1]  Defendants move for summary judgment.  For the reasons stated herein, the Motion will be granted in part and denied in part.

---

[1] This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  Plaintiff is a citizen of New Jersey.  Defendants are citizens of Maryland.  The amount in controversy is alleged to exceed $75,000.

**I.**

Plaintiff and Defendant Wagner, IV were involved in an automobile accident in the parking lot of a K-Mart store in Middle Township, New Jersey, on July 30, 2004. Defendant Wagner, III owned the vehicle operated by Wagner, IV, his son.[2] According to the allegations of the Complaint, which are not disputed for the purposes of the instant motion, Wagner IV backed out of a parking space and hit Plaintiff's pick-up truck.[3] Plaintiff asserts that he suffered serious injuries to his back and neck, which will be discussed in more detail *infra*. The Complaint asserts two counts: Wagner IV's negligence in operating the vehicle, and Wagner III's negligence in entrusting the vehicle to his son.

Because the instant motion mainly attacks the cause of Plaintiff's injuries, a somewhat detailed discussion of Plaintiff's relevant undisputed medical history is necessary. In August, 1982, just before Plaintiff's 26th birthday, while at work,[4] he fell five floors.[5] He broke his leg in two places and fractured his spine at

---

[2] The record before the Court does not indicate the son's age. The Complaint alleges that Defendants share the same address.

[3] The Complaint alleges that Wagner, IV was driving a 1992 Nissan Pathfinder and Plaintiff was driving a 1998 Ford Ranger.

[4] The record suggests Plaintiff worked in the construction business.

[5] The record is not clear whether Plaintiff fell three floors (Defs' Ex. E), or five floors (Defs' Ex. F, H). Plaintiff's answers to interrogatories state that Plaintiff fell five floors.

the C3 bone, which is in the neck.  (Defs' Ex. E)  Upon Plaintiff's release from the hospital, his discharging physician concluded, "[t]he prognosis is fairly good, although there will be prolonged disability from his injuries."  (Defs' Ex. E)

Approximately six years later, in April, 1998, Plaintiff fell again.  He reported to Burdette Tomlin Memorial Hospital complaining of "leg, back, head, [and] neck pain."  (Defs' Ex. G)  Neither the circumstances, nor the severity, of these injuries is disclosed in the record.

Plaintiff fell a third time in October, 1999, injuring his back and left ribs.  (Defs' Ex. I)  As a result, he was unable to work for a little less than a month.  (Id.)

Apparently in connection with his application for permanent disability benefits from the State of New Jersey, Plaintiff underwent medical examinations in 2001 and 2002.  In March, 2001, he was diagnosed with "degenerative disc disease C4-5 and C5-6; Date of onset: 1982."  (Defs' Ex. F)  In that same month, x-rays of Plaintiff's spine revealed:

> There is straightening of the lordotic curve.  There is spur formation anteriorly.  This is particularly noted at C4 through C7.  The neural foramina are narrowed on both the right and left side in the lower cervical region.  No fracture is seen.

(Defs' Ex. F)  The examining doctor concluded that the x-ray showed "straightening of the lordotic curve and degenerative changes." (Id.)

Later in 2001, Plaintiff underwent an MRI of the lumbar spine,

which revealed "small central disc herniations at L4-L5 and L5-S1." (Defs' Ex. K)  Another MRI performed in April, 2002, reported no changes from the 2001 MRI.

In an April, 2002, report, Dr. Sidney Tobias stated that Plaintiff had "a history of significant and debilitating rheumatoid arthritis as well as degenerative joint disease of the cervical spine."  (Defs' Ex. J)

In the years prior to the accident at issue, three MRIs were performed on Plaintiff.  The results of those MRIs are as follows:

- July 24, 2003 "MRI Lumbar Spine WO Contrast": "Disc osteophyte formation at L4-5 and L5-S1 with mild central impression upon the thecal sac.  No disc herniation.  Limited degenerative changes."

- January 13, 2004 "MRI Lumbar Spine WO Contrast":

    "1. At L2-3 and L3-4, there are mild disc bulges without significant compromise to the central canal or neural foramen.

    2. At L4-5, there is a diffuse disc bulge, but in addition, there appears to be a small to moderate size right paracentral and right proximal foraminal disc extrusion with superior migration of disc material with respect to the L4-5 disc space.  This indents the right side of the thecal sac and lies in the region of the descending right nerve root at L4-5.  There is also moderate canal narrowing on the right side at L4-5.  There is facet degeneration at L4-5.

    3. At L5-S1, there is a disc bulge with a tiny central protrusion.  Again, there is facet degeneration at L5-S1."

- January 19, 2004 "MRI C-Spine Without Contrast":

    "1. There is congenital narrowing of the

        spinal canal with degenerative changes, most prominent at C4-5 where there is edema involving the C4 and C5 vertebral body likely on the basis of degenerative disease.

2. At C2-3, there is a tiny central protrusion without significant compromise to the central canal.

3. At C3-4, there is mild bilateral uncinate hypertrophy with mild neural foraminal narrowing bilaterally.  There is a mild disc bulge.

4. At C4-5, there is a central to right paracentral disc osteophyte complex and right uncinate hypertrophy.  The findings result in moderate to marked right foraminal narrowing.  There is mild narrowing of the left neural foramen secondary to uncinate hypertrophy and there is moderate central canal narrowing.

5. At C5-6, there is a central or left paracentral disc ostephoyte complex with uncinate hypertrophy.  This indents the left side of the spinal cord.  There is bilateral uncinate hypertrophy as mentioned.  The findings result in moderate to marked neural foraminal narrowing, left greater than right.

6. At C6-7, there is a left foraminal disc ostephyte complex with uncinate hypertrophy.  The findings result in moderate to marked left neural foraminal narrowing.

7. At C7-T1, there is a mild left foraminal protrusion with mild bony hypertrophy in the left foraminal location.  The findings result in mild left neural foraminal narrowing.

8. There are mild disc bulges at T1-2 and T2-3."

(Defs' Exs. K, L)

The parties' accident occurred approximately seven months after the January, 2004 MRI.  Plaintiff asserts that the accident caused "multiple vertebral fractures, significant aggravation of disc disease at C4-5 and C5-6, cervical radiculopathy, cervical herniated nucleus pulposus, as well as probable aggravation of lumbar herniated nucleus pulposus at L4-5 and a bulging annulus L5-S1." (Pl's Answers to Interrogatories, ¶ 3)  Plaintiff further contends that as a result of these injuries, he underwent surgery on his cervical spine at C4-5 and C5-6[6] on December 7, 2004. (Id.)

Defendants move for summary judgment, asserting that Plaintiff has failed to adduce sufficient evidence demonstrating that his injuries were caused by the accident.  Defendants rely on Plaintiff's extensive medical history of back and neck problems, asserting that Plaintiff cannot prove that the accident on July 30, 2004, caused his injuries.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

---

[6] Plaintiff underwent "an anterior C4-5 and C5-6 microdiskectomy for spinal cord and nerve root decompression with anterior interbody arthrodesis C4-5 and C5-6 with left iliac crest autograft, insertion of ventral plate fixation C4-6 with Atlantis instrumentation and harvesting of left iliac crest bone graft." (Pl's Answers to Interrogatories, ¶ 3; see also Pl's Ex. D)

6

judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

"'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'– that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*).  The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### III.

Under AICRA,

> One of the following two tort options shall be elected, . . .by any named insured required to maintain personal injury protection coverage . . . . (a) Limitation of lawsuit option.  Every owner, registrant, operator, or occupant of an automobile . . . is [] exempt from tort liability for non-economic loss to a person . . ., unless that person has sustained bodily injury which results in . . . permanent injury within a reasonable degree of medical probability. . . .  An injury shall be considered permanent when the body part . . . has not healed to function normally and will not heal to function normally

>            without further medical treatment. . . .[7]
>       In order to satisfy the tort option provisions of
>       this subsection, the plaintiff shall, within 60 days
>       following the date of the answer to the complaint by the
>       defendant, provide the defendant with a certification from
>       the licensed treating physician or a board-certified
>       licensed physician to whom the plaintiff was referred by
>       the treating physician. The certification shall state,
>       under penalty of perjury, that the plaintiff has sustained
>       an injury described above. The certification shall be
>       based on and refer to objective clinical evidence, which
>       may include medical testing. . . . Such testing may not
>       be experimental in nature or dependent entirely upon
>       subjective patient response.

N.J.S.A. 39:6A-8(a).  This sub-section of AICRA is known as the "verbal threshold."  *See Davidson v. Slater*, 189 N.J. 166, 169 (2007).

  *Davidson* recognizes two types of verbal threshold cases: cases where a plaintiff alleges "aggravation of pre-existing injuries" ("aggravation cases"), and "non-aggravation" cases.  189 N.J. at 169-70.  The New Jersey Supreme Court held in *Davidson*,

>    When a plaintiff alleges aggravation of pre-existing
>    injuries as the animating theory for the claim, the
>    plaintiff must produce comparative evidence to move
>    forward with the causation element of that tort action.
>    When a plaintiff does not plead aggravation of pre-
>    existing injuries, a comparative analysis is not
>    required to make that demonstration.

*Id.* at 170.

  Because this case is both an aggravation and non-aggravation case, Defendant argues that Plaintiff must produce comparative

---

  [7] At least for purposes of the instant motion, the parties do not dispute that Plaintiff sustained a "permanent injury," as that term is defined by the statute.

evidence ruling out his previous injuries as causes of his alleged injuries in this case.  Plaintiff undisputedly has not produced such evidence.  Thus, according to Defendants, they are entitled to summary judgment.

Plaintiff, on the other hand, asserts that he need not produce a comparative analysis because he asserts new injuries in addition to the aggravation of pre-existing injuries.  Plaintiff relies on *Johnson v. Scaccetti*, which holds that a plaintiff may collect "non-economic damages for all injuries proximately caused by an automobile accident when only a single injury satisfies a threshold category." 192 N.J. 256, 278 (2007).  According to Plaintiff, his new injuries satisfy the verbal threshold without the need for producing a comparative analysis, and his other aggravated injuries may be considered in calculating damages.

Considering *Davidson* and *Johnson* together, the Court concludes that Plaintiff is not required to produce a comparative analysis in order to satisfy AICRA's verbal threshold requirement.  If Plaintiff had alleged only aggravation of existing injuries, summary judgment would be warranted under *Davidson*.  But because Plaintiff also alleges new injuries, and those new injuries "vault the verbal threshold"[8] without the need for employing a comparative analysis, Plaintiff may recover for all other injuries *proximately caused* by the accident.  *Johnson*, 192 N.J. at 261-62 (emphasis added).

---

[8] *Davidson*, 189 N.J. at 169.

9

However, as *Davidson* observes, the burden of proof as to causation of all injuries lies with the Plaintiff. 189 N.J. at 185-86. Thus, even though the absence of a comparative analysis is not fatal to Plaintiff establishing the verbal threshold element of his case, it may well be fatal to establishing the link between his aggravated injuries and the accident:

> a plaintiff will risk dismissal on summary judgment if the defendant[s] can show that no reasonable factfinder could conclude that the defendant[s'] negligence caused plaintiff's alleged [injuries]. . . . the plaintiff who does not prepare for comparative medical evidence is at risk of failing to raise a jury-worthy factual issue about whether the subject accident caused the injuries.

*Id.* at 188. With this understanding, the Court turns to Plaintiff's evidence.

Plaintiff's Certification of Treating Physician, submitted in accordance with N.J.S.A. 39:6A-8(a), reports that an MRI of Plaintiff's cervical spine, taken approximately three weeks after the accident, revealed, among other things, "an undisplaced fracture of C4 and superior aspect of C5." (Defs' Ex. C)[9] Dr. Zerbo (Plaintiff's treating physician) has concluded that this injury was "directly related to the motor vehicle accident that occurred on

---

[9] In an earlier report, Dr. Zerbo stated, "[Plaintiff] has a very severe injury to the cervical spine producing cervical vertebral body fractures involving C4 and C5 and actually has spinal cord impingement at this level. . . . At this point, it appears [Plaintiff] will require, at least based on what is seen on his MRI, decompression of his spinal cord with internal fixation." (Pl's Ex. B)

10

July 30, 2004," (Defs' Ex. D), and that the injury is "permanent" with "permanent residual sequella." (Defs' Ex. C) Moreover, Dr. Zerbo states that despite the corrective surgery performed on Plaintiff in December, 2004, "the permanent residuals of the injury cannot be completely resolved." (Defs' Ex. C)[10] This evidence satisfies the verbal threshold, N.J.S.A. 39:6A-8(a).

Turning next to the cause of the C4-C5 fractures, a reasonable factfinder could find that the accident was the proximate cause of the injury. Nothing in Plaintiff's medical history indicates a fracture of the C-4 or C-5 bones at any time. A reasonable juror could infer from this evidence that the accident caused the fractures. Accordingly, Defendants' Motion, as it relates to Plaintiff's neck fractures, must be denied. Plaintiff may present at trial his claim that the July 30, 2004 accident caused him to break his neck.

In addition to the neck fracture, Plaintiff's other asserted non-aggravated injuries include cervical radiculopathy and cervical herniated nucleus pulposus. Dr. Lowe[11] concluded that Plaintiff suffered from "[c]ervical radiculopathy and cervical HNP [herniated

---

[10] In a separate report to Plaintiff's attorney, Dr. Zerbo stated that the surgery to fuse Plaintiff's cervical bones "will produce permanent residual impairments . . . including diminished range of motion to the cervical spine." (Pl's Ex. D)

[11] Dr. Lowe was one of two surgeons who performed Plaintiff's surgery.

11

nucleus pulposus][12] . . . related to injuries sustained in motor vehicle accident on 7/30/04." (Pl's Ex. D)  Like Plaintiff's neck fracture, nothing in the record indicates that these injuries existed before the accident,[13] therefore a reasonable juror could infer that the accident was the proximate cause of the injuries. Accordingly, Defendants' Motion, as it relates to Plaintiff's cervical radiculopathy and cervical herniated nucleus pulposus, must be denied.  Plaintiff may present at trial his claim that the July 30, 2004 accident caused such injuries.

As to Plaintiff's aggravated injuries, namely, "significant aggravation of disc disease at C4-5 and C5-6" and "probable aggravation of lumbar herniated nucleus pulposus at L4-5 and a bulging annulus L5-S1" (Pl's Answers to Interrogatories, ¶ 3), Plaintiff has not provided any evidence of causation.  While Plaintiff asserts that his conditions were aggravated, none of his doctors' reports specifically state that the conditions were aggravated as a result of the accident.  Moreover, there is no evidence in the record excluding all prior injuries as the cause of

---

[12] A herniated nucleus pulposus is also known as a cervical disc herniation, colloquially referred to as a "slipped disc." Leon Wolfstone, Jack Liebman, Robert Bingham, & Charles Parnell, Courtroom Medicine §§ 5.22; 21.22 (2008).  Cervical radiculopathy, or nerve root irritations of the neck, may be caused by trauma to the cervical spine.  *Id.* at § 22.00.

[13] While there is some evidence that Plaintiff suffered previous herniations in his *lumbar* spine at L4-L5 and L5-S1, *see supra* p. 4, there is no evidence of prior *cervical* herniations.

12

those conditions.[14]  *See Davidson*, 189 N.J. at 170.  No reasonable factfinder could find causation as to the aggravated injuries.  Accordingly summary judgment must be granted.  Plaintiff may not present at trial evidence of the aggravated injuries, even as they relate to damages.

**IV.**

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted as to Plaintiff's claims based on alleged aggravation of pre-existing injuries but denied as to Plaintiff's non-aggravation claims (i.e., those based on the C4-C5 fractures, and cervical radiculopathy and cervical herniated nucleus pulposus).  An appropriate order will be issued.

Dated: November 19, 2008

                                        s/ Joseph E. Irenas
                                      **Joseph E. Irenas, S.U.S.D.J.**

---

[14] The record contains no depositions and no formal expert reports, only Plaintiff's medical records and reports from various neurosurgical consultations in connection with Plaintiff's December 2004 surgery.